**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

JANE DOE, on her own behalf, on behalf of her husband, John Doe, and on behalf of all others similarly situated,

               Plaintiff,

    v.

UNITEDHEALTH GROUP INC., UNITED HEALTHCARE INSURANCE CO., OXFORD HEALTH PLANS, LLC, OXFORD HEALTH PLANS (NY), INC., and OXFORD HEALTH INSURANCE, INC.,

               Defendants.

Civil Action No. 1:17-cv-4160-AMD-RML

**AMENDED CLASS ACTION COMPLAINT**

---

Plaintiff Jane Doe ("Plaintiff")[1] complains as follows on her own behalf, on her husband's behalf, and on behalf of all others similarly situated, based on the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances by herself and her undersigned counsel, against Defendants:[2]

---

[1] Plaintiff challenges Defendants' under-reimbursements for covered mental health services. Because mental illness remains subject to pervasive stigma, Plaintiff and her husband have legitimate concerns about publicly disclosing their psychiatric conditions. Thus, Plaintiff requested to file this action pseudonymously, using "Jane Doe" for Plaintiff and "John Doe" for her husband. The Court granted Plaintiff's request on July 20, 2017. Doc. No. 11.

[2] On August 20, 2018, the Court issued an order dismissing all claims asserted against Defendants UnitedHealth Group Inc., United HealthCare Insurance Co., Oxford Health Plans, LLC, and Oxford Health Plans (NY), Inc. (the "Non-OHI Defendants"). Doc. No. 45 at 16. The Court also dismissed Counts II and III against all Defendants. *Id.* Finally, the Court dismissed Counts IV and V against all Defendants to the extent they rely on Counts II and III. *Id.* at 15. In an abundance of caution, this Amended Class Action Complaint names the Non-OHI Defendants and asserts the dismissed claims solely for the purposes of preserving any appeal of the Court's order of dismissal.

## INTRODUCTION

1.      Office-based psychotherapy is a mainstay of mental health treatment. Research published by the National Institutes of Health on managed behavioral healthcare network trends indicates that psychotherapy constitutes the lion's share (84%) of outpatient, office-based mental healthcare claims. *See* Reif, Horgan, Torres, & Merrick (2010). Psychotherapy and counseling services are most commonly delivered by psychologists and master's level clinicians who, according to a 2015 Congressional Research Service report, are generally the most plentiful core mental health provider types.

2.      Meanwhile, mental health conditions affect millions of Americans—the National Institute of Mental Health estimates 26% of American adults suffer from some type of mental health condition each year. The World Health Organization reports that mental health and substance abuse disorders are among the leading causes of disability in the United States. Outpatient psychotherapy plays a critical role in addressing these pervasive public health issues.

3.      Despite the imperative to ensure access to high quality psychotherapists, Defendants UnitedHealth Group Inc. ("UHG"), United HealthCare Insurance Co. ("UHIC"), Oxford Health Plans, LLC ("OHP"), Oxford Health Plans (NY), Inc. ("OHP-NY"), and Oxford Health Insurance, Inc. ("OHI") (collectively, "United" or "Defendants"), which cover more than one in five Americans, are violating legal duties they owe to health insurance plan participants and beneficiaries by improperly discriminating against them and their providers. Specifically, Defendants have imposed and continue to impose arbitrary reimbursement penalties on psychotherapy rendered by psychologists and master's level counselors (and thus on the lion's share of psychotherapy and office-based mental health treatment). These penalties are neither equally imposed on office-based medical/surgical care nor grounded in actual provider quality/expertise. The policies violate federal and state mental health parity laws and provider

anti-discrimination statutes and are inconsistent with the terms of the relevant insurance plans administered by Defendants.

4.     Plaintiff is a participant in a fully-insured large employer health insurance plan ("Plan") drafted, issued, administered and insured by United. Her employer is based in New York City, and her husband, John Doe, is a Plan beneficiary. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

5.     Plaintiff suffers from an eating disorder, for which she receives both individual and family counseling from, respectively, a psychologist with 17 years of experience and a licensed clinical social worker who completed advanced, post-graduate training and has 26 years of experience. Her husband also receives psychotherapy from a different, experienced psychologist and family counseling from the same licensed clinical social worker as his wife. Their independently-licensed providers maintain private practices, do not participate in United's provider network (i.e., they are out-of-network ("ONET"), or non-participating ("Non-Par"), providers), and therefore have not entered into any contract with United to accept United's in-network rates.

6.     Since at least 2015, Plaintiff and her husband have received treatment from their providers and have submitted resulting claims for benefits to United. United processed these claims, determined that they were covered under the Plan, and issued benefit payments under the Plan. As a result, there is no dispute in this case over whether the services at issue were medically necessary or covered by the Plan. The dispute in this case concerns the amount of benefits United determined to pay for the covered services.

7.     Under the terms of Plaintiff's Plan, ONET benefits are to be determined based on an "Allowed Amount," which is the maximum amount of the provider's bill deemed eligible for

reimbursement. Because Plaintiff and her husband sought mental health services from psychologists and master's level counselors, however, United artificially reduced the Allowed Amount by 25% to 35% (United's "Discriminatory Reimbursement Penalty"). Had Plaintiffs sought counseling services from internists without specialized mental health training, for example, United would not have imposed this 25%-35% reduction.

8.      By engaging in this type of discrimination against Plaintiff and her husband, based on nothing other than the fact that they sought mental healthcare from the types of clinicians likely to be most available and qualified to provide it, United violated its legal duty (both as a fiduciary and otherwise) to comply with the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act"), which has been incorporated into ERISA at 29 U.S.C. § 1185a. United also violated Section 2706 of the Affordable Care Act codified at 42 U.S.C. § 300gg-5 and which has been incorporated into ERISA at 29 U.S.C. § 1185d; and New York State's mental health parity law, known as "Timothy's Law" (N.Y. Ins. Law § 3221(l)(5)(A)), which has been incorporated as a matter of law into Plaintiff's Plan and, further, has an implied private right of action.

## THE PARTIES

### Plaintiff

9.      Plaintiff, who resides in Brooklyn, New York, is insured as a participant under the Plan, which is a fully-insured, non-grandfathered New York large group commercial policy sponsored by her New York City-based employer. Plaintiff's husband is a beneficiary under the Plan. The Plan, identified as a "New York PPO" (for "Preferred Provider Organization"), is governed by ERISA and is both insured and administered by United. Plaintiff is representing her husband both as a Plan participant and as his agent through an executed Power of Attorney.

4

**Defendants**

10.     Defendant UHG, which is headquartered in Minnetonka, Minnesota, is a publicly held corporation that operates health insurance companies throughout the country through various direct and indirect subsidiaries, including Defendants UHIC, OHP, OHP-NY and OHI. Defendant UHG and its subsidiaries administer both fully-insured health plans (such as the Plan) and those that are self-funded by employers that hire United to administer the plans (collectively "United Plans"). For all United Plans, Defendant UHG and its subsidiaries control the policies and procedures applicable to the processing of benefit claims and, in that capacity, developed and applied the Discriminatory Reimbursement Penalty challenged herein.

11.     Defendant UHIC is a health insurance company that operates nationwide as part of the health insurance operations of Defendant UHG. Defendant UHIC is a wholly-owned subsidiary of UHIC Holdings, Inc., which in turn is a wholly-owned subsidiary of United HealthCare Services, which in turn is a wholly-owned subsidiary of Defendant UHG. Defendant UHIC's corporate headquarters are located in Hartford, Connecticut. Defendant OHI, the issuer of Plaintiff's Plan, is a wholly-owned subsidiary of Defendant UHIC.

12.     Defendant OHP, headquartered in Shelton, Connecticut, is a wholly-owned subsidiary of Defendant UHG, and has been since July 7, 2004. Defendant OHP operates as part of Defendant UHG's health insurance operations, including by developing and overseeing the Administrative Policies for behavioral health services applicable to United plans, including Plaintiff's Plan.

13.     Defendant OHP-NY was incorporated on April 19, 1985 under New York State law as a for-profit corporation for the purpose of providing comprehensive health insurance services. It is a wholly-owned subsidiary of Defendant OHP, with which it shares its corporate

offices. Defendant OHP-NY issued the Explanation of Benefits ("EOB") statements to Plaintiff and her husband that are at issue in this action.

14.     Defendant OHI shares corporate offices with Defendant OHP in Shelton, Connecticut. As of December 31, 1997, Defendant OHI was a wholly-owned subsidiary of Defendant OHP-NY. As of January 24, 2014, Defendant OHI became a wholly-owned subsidiary of Defendant UHIC. Defendant OHI is identified in Plaintiff's Plan as its issuer and administrator.

15.     Due to the authority, discretion and control they have been granted and exercised to make decisions with respect to benefit claims in connection with United Plans (such as Plaintiff's) that are governed by ERISA, each Defendant is a fiduciary and must comply with ERISA's fiduciary requirements in fulfilling its roles, duties and responsibilities with regard to the United Plans.

## JURISDICTION AND VENUE

16.     United's actions in administering employer-sponsored health care plans, including determining reimbursements for Plaintiff under her Plan, are governed by ERISA, 29 U.S.C. § 1001, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

17.     Venue is appropriate in this District. Defendants issue and administer plans in this District, Plaintiff resides here, and the Plan Certificate expressly states that it "is governed by the laws of New York State" and that "[i]f a dispute arises under this Certificate, it must be resolved in a court located in the State of New York."

## STATEMENT OF FACTS

18.     Plaintiff is insured through her employer pursuant to a Preferred Provider Organization Certificate of Coverage ("COC") effective May 1 for each plan year. Plaintiff's large-group, fully-insured policy is non-grandfathered under the Affordable Care Act.

19.     The cover letter for the COC specifies that it was "issued by" Defendant OHI and represents a "Group Policy" between Defendant OHI and the employer group. The COC is signed by Michael McGuire. According to an online profile on LinkedIn, Mr. McGuire is the "Health Plan CEO of NY and NJ" for "UnitedHealthcare" and the "Health Plan CEO" for "UnitedHealth Group," which is, ostensibly, Defendant UHG.

20.     In a blog posted on the internet by Mr. McGuire, he describes himself as being "responsible for commercial and public sector sales and account management, regulatory compliance and network development for UnitedHealthcare's New York market." Prior to assuming that role in 2007, he was "the regional vice president of sales and account management for UnitedHealthcare's Northeast region," having joined Defendant UHG in 1996 where he "played a key role in the integration of Oxford Health Plans following UnitedHealthcare's acquisition of Oxford in 2004."

21.     The COC, which provides in- and out-of-network coverage for both medical and behavioral health services, was provided to Plaintiff as part of a booklet on the letterhead of "UnitedHealthcare/Oxford." The 2016 COC has the following identifier issued by United: OHINY_LG_PPO_COC_2016 and 11579 NY OHI LP G PPO FAIR COC 3.16. The 2017 COC has the following identifier issued by United: OHINY_LG_PPO_SBN_2017 and 11677 NY LG FP PPO NG FAIR COC 1.17.

22.     The introductory letter of the booklet, addressed to "Oxford Member," is from "Oxford Health Plans." Moreover, a section of the COC entitled "Important Telephone Numbers

and Addresses," directs members to the following website for additional information: www.oxhp.com. That website, under the logo for "UnitedHealthcare/Oxford," includes Defendants' Medical and Administrative Policies. These policies, which are issued by Defendant OHP, address clinical, administrative and reimbursement policies relating to coverage under the United Plan, and include the "Behavioral Health Services UnitedHealthcare Oxford Administrative Policy."

23.     Beginning at least in 2015 and continuing until today, Plaintiff and her husband have submitted claims to United for coverage for behavioral health services they have received. Each discrete service received was identified by and billed based on a five-digit code known as a "CPT," which is shorthand for "Current Procedural Terminology." The CPT Codes are developed and licensed for use by the American Medical Association.

24.     The two CPT Codes primarily used by the behavioral health providers for Plaintiff and her husband were CPT Codes 90834, representing psychotherapy for 38-45 minutes with the patient and/or family member, and 90847, family psychotherapy (with the patient present), for 50 minutes.

25.     Plaintiff and her husband submitted claims to United, which processed them and sent to Plaintiff and her husband EOBs reporting how United had processed the claims and what benefits were payable (if any) by the Plan. Each EOB reported, among other things, the Date of Service, the Description of the Service (the CPT Code), the Amount Billed (defined in the EOB as "the total amount that your provider billed for the services provided to you"), the "Deductible Amount" (defined as "[t]he amount you must pay for covered benefits during the plan year before we begin making payments for covered benefits"), the "Patient responsibility" (defined as "[t]he amount you are responsible to pay"), and the "Maximum Amount," defined as follows:

8

The most that is available to pay for covered benefits under your plan. For a participating provider, it is an agreed upon amount. If your plan has out-of-network benefits, it is the lower of the billed amount, the amount available for payment using the plan's out-of-network reimbursement rates and rules, or the amount the provider has agreed to accept as payment. Please see your health benefits plan, including your Summary of Benefits, for more information.

26.     While United uses the term "Maximum Amount" in the EOBs, that is not actually a defined term in the Plan. Rather, "Maximum Amount" is the term United uses in the EOBs to represent the "Allowed Amount," which is the actual term used in the Plan to reflect the amount that is deemed to be covered under the Plan for a particular service.

27.     During the relevant time period, United set the Maximum Amount under the Plan for Plaintiff's husband's ONET psychotherapy sessions (CPT Code 90834) with a psychologist in the applicable zip code at $131.25, while Plaintiff's husband's provider billed at $200 per session. United set the Maximum Amount for ONET family counseling (CPT Code 90847) by a master's level counselor in the applicable zip code at $178.75, while Plaintiff's and her husband's ONET provider billed at $210 (and later at $215) per session.

28.     When Plaintiff and her husband had not yet satisfied their Deductible Amount, United applied the Maximum Amount toward their Deductible. That amount, along with the rest of the billed charges, was then identified in the EOB as the "Amount You Owe." After the Deductible was satisfied, the Maximum Amount was reported in the EOB, along with a non-zero figure for the amount "Your Plan Paid." The "Your Plan Paid" amount was equal to the Maximum Amount minus the coinsurance owed by Plaintiff and her husband (30%), which coinsurance was incorporated into the "Amount You Owe." The remaining portion of the provider's bill (the amount in excess of the Maximum Amount) was wholly owed by Plaintiff and her husband, and also incorporated into the "Amount You Owe."

29.     Thus, when $131.25 was identified as the Maximum Amount for CPT Code 90834, that left $68.75 as the financial responsibility of Plaintiff's husband, above and beyond any coinsurance or copay obligation. Similarly, when $178.75 was identified as the Maximum Amount for CPT Code 90847, that left $31.25 (and then later $36.25) as Plaintiff's (or her husband's)  financial responsibility, above and beyond any coinsurance or copay obligation.

30.     Each EOB was issued under letterhead from "UnitedHealthcare/Oxford," with an address in Shelton, Connecticut for OHP-NY. Moreover, each EOB notified Plaintiff or her husband, as applicable, that they could seek additional information or file first or second level internal appeals relating to the benefit determination at an address in Hot Springs, Arizona, for, respectively, the "Oxford Correspondence Department" or the "Oxford Grievance Review Board."

31.     In October 2016, Plaintiff became concerned that the behavioral health benefits she and her husband were receiving from United were less than the amounts to which they were entitled. Plaintiff subsequently reviewed her COC, which defines the "Allowed Amount" as follows:

> **Allowed Amount:**  The maximum amount on which Our payment is based for Covered Services. See the Cost Sharing Expenses and Allowed Amount section of this Certificate for a description of how the Allowed Amount is calculated. If your Non-Participating Provider charges more than the Allowed Amount You will have to pay the difference between the Allowed Amount and the Provider's charge, in addition to any Cost-Sharing requirements.

32.     "Our" is a defined term in the COC to mean Defendant OHI.

33.     The "Cost Sharing Expenses and Allowed Amount" section of the COC also included the following additional description of "Allowed Amount":

10

**Allowed Amount.** "Allowed Amount" means the maximum amount we will pay to a Provider for the services or supplies covered under this Certificate, before any applicable Deductible, Copayment, and Coinsurance amounts are subtracted. We determine our Allowed Amounts as follows:

The Allowed Amount for Participating Providers will be the amount we have negotiated with the Participating Provider.

\* \* \* \*

The Allowed Amount for Non-Participating Providers will be determined as follows:

The Allowed Amount will be 80% of the FAIR Health rate.

34.     "FAIR Health" is an independent company that was established in October 2009 in the wake of revelations that United and other insurers were routinely understating usual, customary and reasonable ("UCR") rates for Non-Par providers. FAIR Health maintains a database of non-discounted charges issued by providers across the country for use by insurers and consumers. It was created as part of a settlement between United and the Office of the Attorney General for the State of New York ("NYAG"), which launched an investigation into the internal and non-public database previously relied upon by United, known as "Ingenix." Under the terms of the settlement with the NYAG, United agreed to use FAIR Health to determine Non-Par reimbursements whenever its plans required benefits to be paid based on UCR or similar language.

35.     FAIR Health has a consumer-oriented website from which the public can ascertain the costs for clinical services in a particular zip code. A consumer need only input the zip code and CPT Code, and FAIR Health reports the charges that most providers bill at a particular percentile.

36.     The above-quoted figure of "80%" identified in Plaintiff's COC means 80th percentile. Defendants' communications, detailed below, as well as context and health insurance

industry custom and practice confirm this understanding. To be clear, the 80th percentile identified in Plaintiff's COC means that 80% of the charges reported to FAIR Health are at or below that particular amount, while the remaining 20% of reported charges are higher than that amount.

37.     After reviewing the COC and determining that FAIR Health was supposed to be used to determine the Plan's Non-Par reimbursement rates, Plaintiff used the FAIR Health database and determined that, in her and her husband's providers' respective zip codes, the 80th percentile amount for CPT Code 90834 was $200, and for CPT Code 90847 was $300, both of which were substantially higher than the Allowed Amounts identified by United in the EOBs it issued with regard to the claims submitted by or on behalf of Plaintiff and her husband.

38.     Plaintiff subsequently contacted United customer service and was informed that United's corporate policy was to reduce the Allowed Amounts for behavioral health services offered by psychologists by 25%, and to reduce the Allowed Amounts for behavioral health services offered by master's level counselors by 35%. Plaintiff was then provided with a copy of the United internal policy documenting this Discriminatory Reimbursement Penalty.

39.     Plaintiff then contacted FAIR Health and verified that its data did not distinguish by provider type, but was based on average data from all providers who were authorized under their respective licenses to perform services specified by the CPT codes in the applicable zip code.

40.     In her communications with United, Plaintiff also learned that United set the Allowed Amount for Non-Par benefits at the 70th percentile of FAIR Health, despite her COC specifying that the 80th percentile would be used.

41.     Under the Department of Labor's claims procedure regulation at 29 CFR
§ 2560.503-1, "adverse benefit determinations eligible for internal claims and appeals processes
generally include denial, ***reduction***, termination of, ***or a failure to provide or make a payment***
***(in whole or in part) for a benefit***, ***including*** a denial, ***reduction***, termination, ***or failure to make***
***a payment based on*** the imposition of a preexisting condition exclusion, a source of injury
exclusion, or ***other limitation on covered benefits***." 80 Fed. Reg. 72192, 72204 (Nov. 18, 2015)
(emphasis added). With respect to non-grandfathered group health plans like Plaintiff's Plan, 29
CFR § 2560.503-1 has also been incorporated into the ERISA statute at 29 U.S.C. § 1185d
(incorporating 42 U.S.C. § 300gg-19(a)(2)(A)), and more generally at 29 U.S.C. § 1133
(mandating claims procedure for ERISA plans "[i]n accordance with regulations of the Secretary
[of Labor]").

42.     The Allowed Amounts authorized by United for the claims submitted by or on
behalf of Plaintiff and her husband, as reflected in the various EOBs, constituted "adverse benefit
determinations" under ERISA because they specified that the allowed benefits were less than the
billed charges of the providers, resulting from United's (1) imposition of its Discriminatory
Reimbursement Penalty and (2) improper use of the 70th percentile, contrary to its purported use
of the 80th percentile, of the FAIR Health database.

43.     Each time United submitted an EOB to Plaintiff or her husband, United violated
the DOL claims procedure regulations (and therefore the ERISA statute). Those regulations
provide that, in notifying a beneficiary of an "adverse benefit determination," the administrator
must include not only "the specific reason or reasons for the adverse determination," but also a
"reference to the specific plan provisions on which the determination is based." 29 CFR §
2560.503-1(g)(1). United violated this provision by only asserting in general terms that the

reimbursement amount was the "Maximum Amount," without referring Plaintiff to the "specific plan provisions" that United relied upon in making its coverage determination and without disclosing the use of United's Discriminatory Reimbursement Penalty in improperly reducing reimbursement levels. Accordingly, United materially and repeatedly deprived Plaintiff and her husband of the due process mandated by ERISA and therefore rendered their claims exhausted. *See* 29 CFR § 2590.715-2719(b)(2)(ii)(F)*(1)* ("In the case of a plan or issuer that fails to strictly adhere to ***all*** the requirements of this paragraph (b)(2) with respect to a claim, the claimant is deemed to have exhausted the internal claims and appeals process of this paragraph (b), except as provided in paragraph (b)(2)(ii)(F)(*2*) of this section. Accordingly the claimant may initiate an external review under paragraph (c) or (d) of this section, as applicable. The claimant is also entitled to pursue any available remedies under section 502(a) of ERISA or under State law, as applicable, on the basis that the plan or issuer has failed to provide a reasonable internal claims and appeals process that would yield a decision on the merits of the claim. If a claimant chooses to pursue remedies under section 502(a) of ERISA under such circumstances, the claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary.").

44.     Despite Plaintiff's and her husband's right to immediately initiate litigation in light of United's violations of her ERISA due process rights, on or about October 12, 2016, Plaintiff filed a series of direct appeals with United on her own behalf and on behalf of her husband to challenge its inadequate reimbursements for their individual and family counseling rendered by their psychologists and master's level counselor. In her first appeal, Plaintiff provided a copy of the COC, which showed that the reimbursement level was supposed to be based on an Allowed Amount equal to the 80th percentile of FAIR Health and did not include any provision to reduce payments for psychologists and master's level counselors; screen shots of the

numbers actually reported from FAIR Health; and a calculation of the amount that Plaintiff should have received had the proper FAIR Health data been used, without the improper reductions.

45.     After Plaintiff filed the appeals, United acknowledged receiving them on November 14, 2016 (with respect to Plaintiff's family counseling) and November 29, 2016 (with respect to Plaintiff's husband's individual therapy), but gave Plaintiff and her husband a substantial run-around: it repeatedly asked them to execute HIPAA authorizations (which were provided on multiple occasions) and responded to their appeals by completely mischaracterizing the nature of their grievances (i.e., stating that Plaintiff was appealing the co-insurance amount under her plan, which she had not).

46.     Plaintiff never received a decision from United regarding her family counseling reimbursement appeal that United acknowledged receiving on November 14, 2016. This is unsurprising, given that on March 1, 2017, the New York Department of Financial Services ("DFS") fined United one million dollars for systematically failing to send adverse determination notices and adverse utilization review appeal letters to insureds in violation of New York law. According to the findings of a market conduct examination posted by DFS at http://www.dfs.ny.gov/about/press/pr1703011.htm, "in almost one-third of the cases sampled, the company failed to acknowledge consumer grievances within the required 15-day time frame; it also did not resolve grievance cases regarding referrals or benefit coverage within 30 days; and, in 44% of additional cases sampled, the company failed to issue initial adverse determination letters or adverse determination letters following an appeal within the 30 days mandated by law."

15

47.     On December 15, 2016, Plaintiff's husband received a denial of Plaintiff's appeal on his behalf from United, on UnitedHealthcare/Oxford letterhead from its Hot Springs, Arizona address. United concluded that, based on its review of "the documentation submitted, our payment policies and the limitations, exclusions and other terms of your Benefit Plan, including any applicable Riders, Amendments, and Notices," the benefit payment "was processed correctly" based on the following provision: "Specialist Office Visits (or Home Visits): 30% Coinsurance after Deductible."

48.     United's final adverse determination entirely failed to address the issue which Plaintiff appealed. In particular, Plaintiff never discussed or appealed any imposition of a coinsurance or the calculation of her deductible. Rather, she challenged how United had determined the Allowed Amount for her and her husband's ONET behavioral health providers. United failed to address that issue.

49.     United's final adverse determination went on to inform Plaintiff's husband of the following: "You have the right to file a civil action under Section 502(a) of ERISA (Employment Retirement Income Security Act of 1974)."

50.     After United failed to address Plaintiff's appeals relating to its reimbursement policies, Plaintiff filed complaints on December 1, 2016 with DFS and the NYAG. By letter dated January 20, 2017, the NYAG forwarded to Plaintiff United's response to these grievances.

51.     The United letter, dated January 17, 2017, was issued on "UnitedHealthcare/Oxford" letterhead, from offices of Defendant UHG's national headquarters at 9700 Health Care Lane, Minnetonka, Minnesota 55343. It was signed by a Regulatory Consumer Advocate for United.

52.     In the letter, United focused on Plaintiff's challenge to the percentile of the FAIR

Health database used by United to determine the Allowed Amount (and ultimately

reimbursement) for Non-Par providers. In particular, United denied Plaintiff's claim that United

was supposed to be paying based on an Allowed Amount set at the 80th percentile of FAIR

Health, stating:

> [Plaintiff] states that her Certificate of Coverage (COC) indicates that non-
> network providers are reimbursed at the 80th percentile of the FAIR Health rate.
> Upon review, I determined Oxford correctly processed the claims for services
> rendered by [the provider, a master's level counselor,] according to the member's
> Summary of Benefits (SB) and Oxford's Behavioral Health Policy. However, I
> have determined that the member's Group Policy changed upon renewal on May
> 1, 2016. At that time, [Plaintiff's employer] opted for a New York Large EHB
> Classic Plan with reimbursement being 70% of the Usual, Customary and
> Reasonable (UCR) rate. The language in the COC, effective May 1, 2016, under
> Section IV-Cost-Sharing Expenses and Allowed Amount . . . incorrectly indicates
> the allowed amount will be 80% of the FAIR Health rate. This was not listed in
> the previous COC effective from May 1, 2015, to April 30, 2016. . . . This group
> selected the NY large EHB Classic Freedom Plan 70%. Oxford will give a one-
> time exception because of the error in language in Section IV [of] the member's
> COC. Oxford will pay the claims currently on file from [the provider] for the
> dates of service from May 1, 2016, to December 31, 2016, at 65% of the 80th
> percentile of the FAIR Health rate. Oxford will not extend or duplicate this
> exception. I have enclosed a copy of the Claims Processing Spreadsheet.
>
> [Plaintiff] also filed a complaint for the same issue with the NY Attorney General.
> This complaint includes claims for her spouse . . . for services provided by [a
> psychologist]. We have included in this exception the claims we have on file from
> the date range from May 5, 2016 through November 25, 2016, to pay at 75% of
> the 80th percentile of the FAIR Health rate. We have enclosed a copy of the
> Claims Processing Spreadsheet.

53.     As reflected in United's letter, while it purported to reprocess the claims during a

set period of time to pay based on an Allowed Amount equal to the 80th percentile of FAIR

Health rather than the 70th percentile, it continued to apply United's Discriminatory

Reimbursement Penalty to its benefit determinations. That is, it reduced the Allowed Amount,

which came from the 80th percentile of the FAIR Health rate, by 25%-35%, depending on whether the treating provider was a psychologist or a master's level counselor.

54.     United attached a Claims Processing Spreadsheet to its letter which described how United was reprocessing the claims for the specified time period. For example, for services provided by a master's level counselor during the period May 1, 2016 through December 31, 2016, United stated:

> Claim processed correctly at 65% of UCR for Provider's specialty and member's benefit. Provider is a [Licensed Clinical Social Worker ("LCSW")]. Oxford policy reimburses at 65% of UCR. Claim was processed correctly per Member's COC effective 05/01/2014-04/30/2016. Due to error in the COC for renewal 5/1/16, Oxford has made an exception [and] reprocessed the claim to pay at 65% of the 80th of FAIR Health.

55.     United reported the same reprocessing for claims relating to services provided by a psychologist during the period May 5, 2016 through November 25, 2016, but this time setting the Allowed Amount at 75% of the 80th percentile of FAIR Health.

56.     Notably, while United's spreadsheet did not identify any reprocessed claims prior to May 1, 2016, it confirmed that United had applied its Discriminatory Reimbursement Penalty during the prior period. Several dates of service in February and March 2016 were included on the Claims Processing Spreadsheet, for example, which stated:

> Claim processed correctly at 65% of UCR for Provider. Provider is a LCSW. Oxford policy reimburses at 65% of UCR. Claim was processed correctly per Member's COC effective 05/01/14-04/30/2016.

The Spreadsheet revealed that no adjustment had been made to the applicable claims, such that Plaintiff and her husband have continued to suffer the impact of United's Discriminatory Reimbursement Penalty, with United making no further payments on those claims.

57.     After receiving United's response to her grievance, Plaintiff again reviewed her COC online. She was surprised to discover that United had surreptitiously changed the COC and

altered the definition of "Allowed Amount" to include an explicit provision purporting to allow its reduced reimbursements.

58.     In particular, as quoted above, the original COC stated as follows for Non-Par reimbursement: "The Allowed Amount for Non-Participating Providers will be determined as follows:  The Allowed Amount will be 80% of the FAIR Health rate." In contrast, the new COC, with the following identifier, OHINY_LG_PPO_COC_2016 and 11579 NY LG OHI LP G PPO FAIR COC 1.17, states:

> The Allowed Amount for Non-Participating Providers will be determined as follows:
>
> - Negotiated rates agreed to by the non-Network provider and either us or one of our vendors, affiliates or subcontractors, at our discretion;
>
> - If rates have not been negotiated, then one of the following amounts:
>
>   - For Covered Health Services other than Pharmaceutical Products, the Allowed Amount is determined based on available data resources of competitive fees in that geographic area;
>
>   - ***For Mental Health and Substance Use Disorder Services the Allowed Amount will be reduced by 25% for Covered Health Services provided by a psychologist and by 35% for Covered Health Services provided by a masters level counselor***;
>
>   - When Covered Health Services are Pharmaceutical Products, the Allowed Amount is determined based on 110 – 200% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market.
>
> * * * *
>
> - Our Allowed Amount for non-participating Facilities equates to approximately 44-115% of UCR. For this purpose, UCR is the FAIR Health rate at the 80th percentile. [Emphasis added.]

59.     The new COC no longer referred directly to the FAIR Health database, or what percentile of such database would be used, but merely stated that reimbursement would be

"based on available data resources of competitive fees in that geographic area." Moreover, Defendants had explicitly incorporated United's Discriminatory Reimbursement Penalty into the Plan.

60.     Plaintiff subsequently submitted to DFS and the NYAG a follow-up grievance on March 24, 2017, based on the fact that United was continuing to underpay claims for behavioral health services. In this grievance, she challenged the validity of, among other things, United's Discriminatory Reimbursement Penalty, stating:

> . . . [United's] official response in January 2017 did not address the actual issue and also stated that their policy was to reimburse psychologists at 75% of UCR and master social workers at 65% of UCR. At the time of my complaint, there was no language in my policy which indicated that mental health providers were reimbursed at lower rates based on their degree and ultimately the insurer must follow the terms of the certificate of coverage. Additionally, I stated in my initial complaints that reducing the UCR for non-MDs exclusively in mental health care was an indication of a parity violation particularly since non-MDs provide most of mental health services and FAIR Health database includes claims from all providers of the service and not just MDs.

61.     United responded to Plaintiff's follow-up grievance by letter dated May 3, 2017, which DFS forwarded to Plaintiff on May 4, 2017, and the NYAG forwarded to Plaintiff on May 11, 2017. United's May 3, 2017 response came from the same source as United's initial January 17, 2017 response, was submitted under the UnitedHealthcare/Oxford logo, listed the address of Defendant UHG's headquarters in Minnetonka, Minnesota, and was signed by the same United Regulatory Consumer Advocate.

62.     In the letter, United confirmed that under Plaintiff's Plan "the 'Allowed Amount' [for Non-Par providers] was defined as '80% of the FAIR Health rate.'" United then asserted, however, that as of May 1, 2016, it had changed the Plan to provide that "the Allowed Amount is determined based on available data resources of competitive fees in that geographic area," while also adding United's Discriminatory Reimbursement Penalty.

63.    Summarizing Plaintiff's complaint that, as a result of United's Discriminatory Reimbursement Penalty, she "was responsible for a large share of the bill and took longer to meet [her] deductible and out of pocket maximum," United asserted that it had "determined that the Allowed Amount was determined in accordance with the revised Policy provisions applicable to the 2016 plan year," but that, "due to a drafting error, the 2016 Certificate did not contain the updated language." It then added that "[t]his error has since been corrected," apparently referring to the revised 2016 COC which United placed on the website.

64.    As a result of what it called its "error," United summarized its initial action in responding to Plaintiff's first grievance, as follows:

> Because of Oxford's drafting error, Oxford agreed to pay the members' behavioral health claims for dates of service May 1, 2016, to December 31, 2016, using 80% of the FAIR Health rate as the Allowed Amount. The claims are subject to reductions to the Allowed Amount for services provided by a master's level counselor (65% of the 80% FAIR Health rate), and provided by a psychologist (75% of the 80% FAIR Health rate).

65.    The letter explained, "[i]n an effort to resolve these issues," that:

> With respect to the application of the Allowed Amount reduction [i.e., the Discriminatory Reimbursement Penalty], our review shows that the claims in question were paid at the 80% of FAIR Health rate, but that a reduction based on provider type was then applied. The reduction for non-participating, non-physician providers is embedded within the revised "Allowed Amount for Non-Participating Provider" provisions in the corrected COC. However, because this language was not specifically included in the un-corrected Policy, we will agree to reprocess claims received for dates of service on or after May 1, 2016, through April 31, 2017, without the application of the Allowed Amounts reductions, with applicable prompt pay interest."

66.    United attached to the letter a spreadsheet "which reflects the payment details" relating to its reprocessing of Plaintiff's claims. "However," United added, "claims incurred on or after May 1, 2017, will be reimbursed in accordance with the corrected COC," meaning that United would continue to apply United's Discriminatory Reimbursement Penalty going forward.

21

67.     United then explained in its letter why it did "not believe that [United's Discriminatory Reimbursement Penalty] violate[s] either the federal or state mental health parity requirements":

> The reimbursement coding for medical/surgical uses separate sets of code to reflect the different types of providers even where the services may be the same service (e.g. initial evaluation office visit) which reflects variation in the level of training and experience relative to the services provided by provider type (e.g. internist, pediatrician, dermatologist, cardiologist). In contrast, for mental health/substance use disorder services, the various behavioral provider types (e.g. psychiatrist, psychologist, master's level social worker) utilize the same set of codes which conflates the reimbursement data for these different provider types as well as not reflecting the differing nature of the treatment approach in the practice of psychiatry, psychology and social work.

> The methodology for mental health/substance use disorder services are reimbursed based on the difference in provider types, using the singular set of codes. Just as we believe the rates of reimbursement for a neurosurgeon vary from the reimbursement to an internist that is reflected in the different sets of billing codes used by the different types of medical providers. In addition, it is our understanding that CMS pays differential rates for psychiatrists, psychologists, and social workers. Thus, we believe the practice is comparable to both the medical practice under the plan from a parity perspective and consistent with CMS policy and practice.

68.     United's explanation to the regulators was based on false premises and is entirely disingenuous. CPT Codes are based on the service that is provided, not the type of provider offering the service. Moreover, United's mental health reimbursement methodology arbitrarily over-values any ONET physician who does not have specialized mental health training and experience, including non-psychiatrists such as general practitioners and internists. Any physician providing individual and family counseling uses the same CPT codes as psychologists and master's level counselors. Furthermore, those physicians (including but not limited to psychiatrists) who provide medication management, which psychologists and master's level clinicians cannot offer, are actually reimbursed for that service based on physician-only, separate

(or additive, if rendered in conjunction with psychotherapy/counseling) Evaluation & Management ("E&M") codes that account for those physicians' medical training and experience.

69.      Thus, United justifies its Discriminatory Reimbursement Penalty by conflating its reimbursement methodology for medical/surgical providers, ostensibly based on different specialty-specific service codes that would logically account for varying provider types (i.e., immunologists providing office-based infusions, gastroenterologists providing office-based endoscopies), with a mental health reimbursement methodology that arbitrarily penalizes psychologists and master's level counselors for providing a highly specialized clinical service, psychotherapy, that physicians (whether psychiatrists or otherwise) may not at all be more qualified to deliver.

70.      United's reference to disparate reimbursement methodologies used by Medicare was equally disingenuous. Medicare is not subject to the Federal Parity Act or the ACA's provider anti-discrimination mandate, and reimbursement under Plaintiff's Plan is not based on Medicare, but rather on FAIR Health.

71.      In summary, United categorically applies an arbitrary Discriminatory Reimbursement Penalty to the lion's share of mental health providers (psychologists and master's level counselors), thereby subjecting the lion's share of out-of-network, office-based mental health and substance use disorder benefits to strategies and factors not equally imposed on out-of-network, office-based medical/surgical benefits.

72.      The United letters make clear that Defendants only reprocessed Plaintiff's claims to address the use of United's Discriminatory Reimbursement Penalty during the limited period of May 1, 2016, through April 31, 2017. Prior to that time, however, it had also applied (and

failed to remedy) the Discriminatory Reimbursement Penalty to reduce benefits, as reflected in United's response to Plaintiff's first grievance filed with DFS and the NYAG.

73.     These reductions based on United's Discriminatory Reimbursement Penalty were applied to Plaintiff and her husband at least as of 2015 (although United had in fact operationalized its Discriminatory Reimbursement Penalty through a series of internal reimbursement policies issued as early as 2013 and possibly even before then).

74.     In an EOB for Plaintiff's husband's individual psychotherapy provided in December 2015, for example, United reported that the provider had billed $175 for CPT Code 90834 and that United set the "Maximum Amount" at $131.25, the same Allowed Amount which it continued to use for claims in January and February of 2016 as part of its implementation of United's Discriminatory Reimbursement Penalty.

75.     In its written correspondences to the NYAG and DFS concerning Plaintiff's grievances, United has made clear that it will continue to apply its Discriminatory Reimbursement Penalty to post-May 2017 claims submitted by Plaintiff and her husband.

76.     Although Plaintiff's 2017 COC again refers to a reimbursement methodology set at the 80th percentile of FAIR Health and states nothing at all about United's Discriminatory Reimbursement Penalty, as of May 1, 2017 United has continued to issue EOBs for Plaintiff's individual and family counseling that both violate the DOL's claims procedure regulations (and the ERISA statute) and fail to reimburse claims pursuant to the terms of Plaintiff's Plan (at the 80th percentile of FAIR Health and not subject to United's Discriminatory Reimbursement Penalty).

77.     For example, in an EOB issued in June 2017, relating to services provided to Plaintiff in May 2017, United reported that the provider, an LCSW, had billed $215 for five

separate counseling sessions using CPT Code 90847. United identified the "Maximum Amount" as $178.75 for each service, the same amount it has used through the applicable time period. This amount reflects exactly 65% of $275, which is the 70th percentile of the FAIR Health database for the zip code in which the service was provided. The 80th percentile is $300. Thus, the EOB demonstrates that United is continuing to apply its Discriminatory Reimbursement Penalty, even though that Penalty is not included in the new 2017 COC, and it is applying the 70th percentile of FAIR Health, even though the new COC calls for using the 80th percentile.

78.     Plaintiff and her husband continue to be, respectively, a participant and beneficiary under the Plan, and continue to seek the mental health treatment described above. Plaintiff and her husband have been injured by Defendants' use of United's Discriminatory Reimbursement Penalty and its misapplication of the FAIR Health database in the past and they will continue to be injured in the future.

79.     Defendants' decision to adopt and apply United's Discriminatory Reimbursement Penalty, both prior to and after the inclusion (and subsequent withdrawal) of language purporting to authorize that methodology, was an enterprise-wide decision made by Defendant UHG in consultation with its subsidiaries, including other Defendants. This is demonstrated by, among other things, the fact that United has inserted the same language into numerous non-Oxford plans issued or administered by United.

80.     Through a New York Freedom of Information Law request to DFS, Plaintiff discovered that United has issued COCs to other commercial group plans that expressly incorporate United's Discriminatory Reimbursement Penalty. For example, a sample 2014 UnitedHealthcare Choice Plus COC, drafted by United and issued to "enrolling groups," indicated that:

25

Eligible Expenses are determined solely in accordance with our reimbursement policy guidelines, as described in the Certificate . . .

> • If rates have not been negotiated, then one of the following amounts:

>> + For Covered Health Services other than Pharmaceutical Products, Eligible Expenses are determined based on available data resources of competitive fees in that geographic area.

>> **+ For Mental Health Services and Substance Use Disorder Services the Eligible Expense will be reduced by 25% for Covered Health Services provided by a psychologist and by 35% for Covered Health Services provided by a masters level counselor.** [Emphasis added.]

81.     Similarly, in a self-funded Choice Plus HSA Plan issued by United (using the label UnitedHealthcare as the administrator, with no reference to Oxford) for a large employer based in Illinois, Defendants use the analogous term "Eligible Expenses" instead of "Allowed Amount" to describe how benefits will be determined and states that for services received from Non-Par providers it will determine Eligible Expenses based either on an amount negotiated between United or one of its agents and the provider or:

> If rates have not been negotiated, then one of the following amounts:

> • Eligible Expenses are determined based on 110% of the published rates allowed by [CMS] for Medicare for the same or similar service within the geographic market, with the exception of the following:

>> o 50% of CMS for the same or similar laboratory service;

>> o 45% of CMS for the same or similar durable medical equipment, or CMS competitive bid rates;

> * * * *

> • **For Mental Health Services and Substance Use Disorder Services the Eligible Expense will be reduced by 25% for Covered Health Services provided by a psychologist and by 35% for Covered Health Services provided by a masters level counselor.** [Emphasis added.]

82.     This COC was based on a sample model drafted and implemented by United, as demonstrated by the fact that it is virtually identical to a sample UHIC Certificate of Coverage placed on United's website at https://www.uhc.com/content/dam/uhcdotcom/en/Legal/PDF/MY-7.pdf. In this sample COC, United also uses "Eligible Expenses" as well as the identical language relating to reimbursement for Non-Par providers, including the provision detailing United's Discriminatory Reimbursement Penalty.

83.     The only difference between the UHIC sample policy and the Illinois plan cited above is that United's sample policy reports that "Eligible Expenses are determined based on [110 – 200%] of the published [Medicare] rates," demonstrating that this is a template form United then applies toward its various Plans. While the methodology used for setting the "Allowed Amount" or "Eligible Expenses" may vary, Defendants sought to insert in all such United Plans United's Discriminatory Reimbursement Penalty.

84.     Thus, regardless of which United subsidiary is serving as the claims administrator of the plan, United has adopted and is implementing an enterprise-wide policy for Plans it issues under which the Allowed Amount or Eligible Expenses for Non-Par mental health services are categorically reduced 25%-35% for behavioral health services provided by psychologists and master's level counselors.

## **VIOLATION OF THE FEDERAL PARITY ACT**

85.     The Federal Parity Act, which is incorporated into ERISA at 29 U.S.C. § 1185a, prohibits discrimination with respect to mental health and substance use disorder benefits. The statute requires that any group health plan, such as Plaintiff's Plan, which "provides both medical and surgical benefits and mental health or substance use disorder benefits . . . shall ensure that:

(i) the financial requirements applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant financial

27

requirements applied to substantially all medical and surgical benefits covered by the plan (or coverage), and there are no separate cost sharing requirements that are applicable only with respect to mental health or substance use disorder benefits; and

(ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."

86.     The Federal Parity Act defines "financial requirements" to include "deductibles, copayments, co-insurance, and out-of-pocket expenses." 29 U.S.C. § 1185a(a)(3)(B)(i). When applying the Discriminatory Reimbursement Penalty, United categorically reduces the Allowed Amount or Eligible Expenses for Non-Par mental health services. United's categorical reduction of Allowed Amounts or Eligible Expenses increases "out of pocket expenses" because such reductions force United's participants and beneficiaries to shoulder a greater portion of their provider's charges for mental health services. Thus, United's Discriminatory Reimbursement Penalty is a discriminatory financial requirement under the Federal Parity Act.

87.     The Federal Parity Act also prohibits "separate cost sharing requirements that are applicable only with respect to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(B)(i). When it is included as a plan term, the Discriminatory Reimbursement Penalty expressly states it is limited to mental health services: "***For Mental Health and Substance Use Disorder Services*** the Allowed Amount will be reduced" a certain percentage (emphasis added). The Schedules of Benefits included with each of Plaintiff's Certificates of Coverage contains a section that describes "cost sharing," and that section includes "Allowed Amount." Therefore, United Discriminatory Reimbursement Penalty is an improper "separate cost sharing requirement" that violates the Federal Parity Act.

28

88.     The Federal Parity Act defines "treatment limitations" as "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." 29 U.S.C. § 1185a(a)(3)(B)(i). In further defining treatment limitations, the Federal Parity Act makes it impermissible for those administering plans to "impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." 29 C.F.R. § 2590.712(c)(4)(i).

89.     It is improper for a plan to have a nonquantitative treatment limitation that applies **_only_** to mental health benefits. *See* 29 C.F.R. § 2590.712(c)(4) at Example 6 (where "no comparable requirement applies to medical/surgical benefits" at all, that requirement "may not be applied to mental health or substance use disorder benefits").

90.     On November 13, 2013, the Department of the Treasury, the Department of Labor and the Department of Health and Human Services jointly issued their "Final Rules" governing the Federal Parity Act. *See* 78 Fed. Reg. 68239-96 ("Final Parity Act Rule"). Among other things, the Final Rules describe "nonquantitative treatment limitations" ("NQTLs"), "which are limits on the scope or duration of treatment that are not expressed numerically," and provide an "illustrative list" of NQTLs which are subject to the Federal Parity Act requirements. This non-exhaustive list includes "methods for determining usual, customary and reasonable charges," which includes the methods United uses for determining allowed amounts or eligible expenses

for Non-Par mental health services. Thus, United's Discriminatory Reimbursement Penalty is a discriminatory NQTL under the Federal Parity Act.

91.     The illustrative prohibition in the Final Parity Act Rule mirrored an earlier articulation by the three federal agencies in their February 2, 2010 Interim Final Rules under the Federal Parity Act and was again highlighted in 2016 by the DOL in its "Warning Signs - Plan or Policy Non-Quantitative Treatment Limitations (NQTLs) that Require Additional Analysis to Determine Mental Health Parity Compliance" at https://www.dol.gov/sites/default/files/ebsa/ laws-and-regulations/laws/mental-health-parity/warning-signs-plan-or-policy-nqtls-that-require- additional-analysis-to-determine-mhpaea-compliance.pdf.

92.     The NYAG has issued a statement summarizing actions by insurers that violate the federal and New York mental health parity acts. The list of "health plan conduct that may suggest violations of mental health parity and other laws" includes the following: "Reduced 'UCR' reimbursement for visits to a non-M.D. out-of-network provider, if the plan has an out-of- network benefit." It is available at https://ag.ny.gov/sites/default/files/pdfs/publications/Mental- Health-Parity-Flyer-for-providers.pdf  and  https://ag.ny.gov/sites/default/files/pdfs/publications/ Mental_Health_Parity_Brochure.pdf.

93.     Defendants' self-serving decision to base United's out-of-network mental health reimbursement methodology for the lion's share of outpatient, office-based services (namely, psychotherapy/counseling) on arbitrary strategies and factors not applied to out-of-network, outpatient medical/surgical office visits violates the Federal Parity Act, as confirmed by the ERISA regulations, the DOL, and the NYAG.[3]

---

[3] On January 25, 2019, the Court denied leave to amend the complaint to allege that the Discriminatory Reimbursement Penalty constitutes an impermissible quantitative treatment limitation ("QTL") under the Federal Parity Act, finding that such amendment is futile. Doc. No. 57. For purposes of appellate preservation, Plaintiff, if allowed, would have alleged that the Discriminatory Reimbursement Penalty constitutes an impermissible QTL.

## VIOLATION OF TIMOTHY'S LAW

94.     United's administration of Plaintiff's Plan is also subject to New York's mental health parity law, known as Timothy's Law. This law provides that an insurer offering a health insurance policy in New York that covers inpatient hospital care or physician services, such as United in this case, must provide "broad-based coverage for the diagnosis and treatment of mental, nervous or emotional disorders or ailments, however defined in such policy, at least equal to the coverage provided for other health conditions." N.Y. Ins. Law § 3221(l)(5)(A).

95.     In order to provide mental health coverage that is "at least equal" to coverage for other health conditions, United may not impose restrictions on mental healthcare that exceed those applicable to medical/surgical care.

96.     Yet, United has done just that. Whereas United pays medical/surgical providers based on the Allowed Amount (or Eligible Expenses) as required under the Plan, it specifically targets behavioral health services provided by psychologists and master's level counselors for a benefit reduction through the application of United's Discriminatory Reimbursement Penalty. This violates Timothy's Law.

## VIOLATION OF THE ACA'S PROVIDER
## ANTI-DISCRIMINATION MANDATE

97.     The Affordable Care Act ("ACA") sought, among other things, to empower insureds to make their own decisions about which medical providers to use for treatment, and explicitly precludes discrimination with respect to benefit payments based on the type of provider, stating in Section 2706 (42 U.S.C. § 300gg-5) as follows:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law. This

> section shall not require that a group health plan or health
> insurance issuer contract with any health care provider willing to
> abide by the terms and conditions for participation established by
> the plan or issuer. Nothing in this section shall be construed as
> preventing a group health plan, a health insurance issuer, or the
> Secretary from establishing varying reimbursement rates based on
> quality or performance measures.

The provision has been incorporated into ERISA through 29 U.S.C. § 1185d.

98.    United's enforcement of its Discriminatory Reimbursement Penalty violates this law because it discriminates against psychologists and master's level counselors by paying them less than the Allowed Amount or Eligible Expenses otherwise used as the basis for determining benefits. Thus, United is discriminating in coverage against psychologists and master's level counselors, despite such providers acting within the scope of their licenses under applicable state law.

99.    Moreover, while the ACA allows "varying reimbursement rates based on quality or performance measures," United has failed to apply such measures here, let alone on any individualized basis (and particularly with respect to Plaintiff and her husband's mental health providers). United's Discriminatory Reimbursement Penalty applies to *all* psychologists and master's level counselors, with no regard to "quality or performance measures" whatsoever. This is particularly egregious, given that such clinicians constitute the bulk of the core mental health work force providing the services at issue and frequently have the most relevant psychotherapy training and experience, yet are paid less than other providers who could well have far less psychotherapy training, experience, patient satisfaction, or treatment success.

## ADDITIONAL ALLEGATIONS RELATING TO UNITED'S
## CONFLICT OF INTEREST AND BREACH OF FIDUCIARY DUTIES

100.    United's misconduct was not an innocent mistake. Instead, it was driven by United's own financial interests, which United elevated above the interests of plan participants

and beneficiaries, including Plaintiff and her husband. United sacrificed the interests of insureds so that it could artificially decrease the amount of benefits it was required to pay from its own assets (i.e., with respect to fully-insured plans) and the assets of its employer-sponsor customers (i.e., with respect to self-funded plans). Moreover, by prioritizing the assets of its employer-sponsored customers over the interests of participants and beneficiaries, United also advanced its own interests in retaining and expanding its business with such customers. As a result, United breached its fiduciary duties under ERISA as a result of the conduct detailed herein.

## CLASS CLAIMS

101.    Plaintiff brings Counts I, III, IV and V on her own behalf, on behalf of her husband, and on behalf of the following Class:

> all participants or beneficiaries in ERISA plans whose claim(s) for behavioral health services provided by out-of-network psychologists or master's level counselors were subjected to United's Discriminatory Reimbursement Penalty.

102.    Plaintiff brings Count II, IV and V on her own behalf, on behalf of her husband, and on behalf of the following Class:

> all New York insureds whose insurance plans are subject to Timothy's Law and whose claim(s) for behavioral health services provided by out-of-network psychologists or master's level counselors were subjected to United's Discriminatory Reimbursement Penalty.

103.    Plaintiff brings Count VI on her own behalf, on behalf of her husband, and on behalf of the following Class:

> all participants or beneficiaries in ERISA plans whose claim(s) for behavioral health services provided by out-of-network psychologists or master's level counselors were subjected to United's Discriminatory Reimbursement Penalty, when the applicable United Plan did not include a specific provision providing for the application of the Discriminatory Reimbursement Penalty.

104.     Plaintiff brings Count VII on her own behalf, on behalf of her husband, and on behalf of the following Class:

>   all participants or beneficiaries in ERISA plans whose United Plans specify that ONET claims were to be paid based on a specified percentile of the FAIR Health database, but whose claims were instead processed by United based on a lower percentile of the FAIR Health database.

105.     Common class claims, issues and defenses exist for one or more of the Classes, including, but not limited to, the following:

>   A.     Whether Defendants devised and drafted the Discriminatory Reimbursement Penalty;
>
>   B.     The reasons why the Discriminatory Reimbursement Penalty was devised and drafted;
>
>   C.     Whether United was required to comply with the Federal Parity Act;
>
>   D.     Whether United's enforcement of the Discriminatory Reimbursement Penalty violates the Federal Parity Act;
>
>   E.     Whether United was required to comply with Timothy's Law;
>
>   F.     Whether United's enforcement of the Discriminatory Reimbursement Penalty violates Timothy's Law;
>
>   G.     Whether United was required to comply with the ACA's anti-discrimination provision;
>
>   H.     Whether United's enforcement of the Discriminatory Reimbursement Penalty violates the ACA's anti-discrimination provision;
>
>   I.     Whether United's enforcement of the Discriminatory Reimbursement Penalty when such Penalty was not identified in the COC was in violation of the COC and ERISA; and
>
>   J.     Whether United's reliance on a percentile of the FAIR Health database in setting ONET reimbursements that was lower than the percentile specified in the applicable COC was in violation of the COC and ERISA.

106.     The members of the Classes are so numerous that joinder of all members is impracticable. United is one of the largest insurers nationwide and in New York. Upon

information and belief, the Classes each consist of thousands of subscribers, although such information is solely in the possession of United.

107.    Common questions of law and fact exist as to all members of each Class and predominate over any questions affecting solely individual members of each Class, including the class action claims, issues and defenses listed above.

108.    Plaintiff's claims are typical of the claims of the Classes' members because, as alleged herein, the Discriminatory Reimbursement Penalty applied to Plaintiff was also applied to members of the Classes.

109.    Plaintiff will fairly and adequately protect the interests of the members of the Classes, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action and health insurance-related litigation (including under both ERISA and state laws), and has no interests antagonistic to or in conflict with those of the Classes. For these reasons, Plaintiff is an adequate class representative under Fed. R. Civ. P. 23.

110.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all members of the Classes is impracticable. Further, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Because this case involves Class members who suffer from eating disorders, a recognized mental health condition, as well as other stigmatized mental health conditions, it can be anticipated that many Class members would be unwilling to have their conditions become public knowledge or would be too intimidated to prosecute their individual claims. The class action process allows a brave individual such as Plaintiff to fight not only for her rights but for the rights of others who are similarly situated.

Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

## COUNT I
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(1)(B), and the Federal Parity Act)

111.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

112.    This count is a claim to recover benefits due to Plaintiff under the terms of her Plan, to enforce her rights under the terms of the Plan, and/or to clarify her rights to future benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

113.    United interpreted Plaintiff's Plan to allow it to reduce benefits for behavioral health services provided by psychologists and master's level counselors below the Allowed Amount or Eligible Expenses payable under the Plan for other Non-Par health care services. In doing so, United violated its legal duty to comply with the Federal Parity Act, as incorporated into ERISA by imposing discriminatory financial requirements, cost share requirements, and/or NQTL's.

114.    Plaintiff was harmed by United's actions because Plaintiff's claims were illegally reduced below the proper level required under the Plan and will continue to be reduced in the future, such that she has been and will continue to be illegally deprived of insurance benefits to which she is entitled.

## COUNT II
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(1)(B), and Timothy's Law)

115.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

116.    This count is a claim to recover benefits due to Plaintiff under the terms of her Plan, to enforce her rights under the terms of the Plan, and/or to clarify her rights to future

benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B). It is based on the incorporation of Timothy's Law into the terms of the Plan, or alternatively pursuant to an implied private right of action to enforce Timothy's Law.

117.     United interpreted Plaintiff's Plan to allow it to reduce benefits for behavioral health services provided by psychologists and master's level counselors below the Allowed Amount or Eligible Expenses otherwise payable under the Plan for other Non-Par health care services. In doing so, United violated its legal duty to comply with Timothy's Law.

118.     Plaintiff was harmed by United's actions because Plaintiff's claims were illegally reduced below the proper level required under the Plan, and will continue to be reduced in the future, such that she has been and will continue to be illegally deprived of insurance benefits to which she is entitled.

## COUNT III
**(Claim for relief under ERISA, 29 U.S.C. § 1132(a)(1)(B), and the Affordable Care Act)**

119.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

120.     This count is a claim to recover benefits due to Plaintiff under the terms of her Plan, to enforce her rights under the terms of the Plan, and/or to clarify her rights to future benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

121.     United interpreted Plaintiff's Plan to allow it to reduce benefits for behavioral health services provided by psychologists and master's level counselors below the Allowed Amount or Eligible Expenses otherwise payable under the Plan for other Non-Par health care services. In doing so, United violated its legal duty to comply with Section 2706 of the ACA, its anti-discrimination provision, as incorporated into ERISA.

122.     Plaintiff was harmed by United's actions because Plaintiff's claims were illegally reduced below the proper level required under the Plan, and will continue to be reduced in the future, such that she has been and will continue to be illegally deprived of insurance benefits to which she is entitled.

## COUNT IV
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(3)(A))

123.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

124.     This count is brought pursuant to ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin United's acts and practices, as detailed herein. Plaintiff brings this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

## COUNT V
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(3)(B))

125.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

126.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief (i) to redress United's violations of the Federal Parity Act, Timothy's Law, and Section 2706 of the ACA, as incorporated into the Plan and ERISA, and/or (ii) to enforce such provisions of ERISA or the Plan. Plaintiff brings this claim only to the extent that the Court finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3)(A).

**COUNT VI**
**(Claim for relief under ERISA, 29 U.S.C. § 1132(a)(1)(B))**

127.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

128.    This count is a claim to recover benefits due to Plaintiff under the terms of her Plan, to enforce her rights under the terms of the Plan, and/or to clarify her rights to future benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

129.    United interpreted Plaintiff's Plan to allow it to reduce benefits for behavioral health services provided by psychologists and master's level counselors below the Allowed Amount or Eligible Expenses payable under the Plan for other Non-Par health care services, pursuant to its application of United's Discriminatory Reimbursement Penalty.

130.    While United has sought to incorporate its Discriminatory Reimbursement Penalty into the United Plans, by placing the language describing the Penalty into the applicable COCs where possible, United has nevertheless applied the Discriminatory Reimbursement Penalty even for COCs, such as the various versions of Plaintiff's United Plan, which do not specifically include language describing the Discriminatory Reimbursement Penalty. The resulting benefit determinations by United are therefore in violation of such United Plans and of ERISA, which requires that United comply with its Plan language.

131.    Plaintiff was harmed by United's actions because Plaintiff's claims were illegally reduced below the proper level required under the Plan even when the applicable Plan did not include language describing United's Discriminatory Reimbursement Penalty, and will continue to be reduced in the future, such that she has been and will continue to be illegally deprived of insurance benefits to which she is entitled.

## COUNT VII
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(1)(B))

132.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

133.    This count is a claim to recover benefits due to Plaintiff under the terms of her Plan, to enforce her rights under the terms of the Plan, and/or to clarify her rights to future benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

134.    United interpreted Plaintiff's Plan to allow it to reduce benefits for health care services offered through ONET providers based on the 70th percentile of the FAIR Health database, even though the applicable COC specified that such benefits were supposed to be based on the 80th percentile of the FAIR Health database. As a result, United's benefit determinations were in violation of the United Plan and ERISA, which requires that United comply with its Plan language.

135.    Plaintiff was harmed by United's actions because Plaintiff's claims were illegally reduced below the proper level required under the Plan, and will continue to be reduced in the future, such that she has been and will continue to be illegally deprived of insurance benefits to which she is entitled.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in her favor against Defendants as follows:

A.      Certifying the Classes and appointing Plaintiff as Class Representative;

B.      Declaring that United violated its legal obligations in the manner described herein;

C.      Permanently enjoining United from engaging in the misconduct described herein;

D.     Ordering United to pay or reprocess all wrongfully denied claims without the illegal limitations described herein, and to authorize the payment of any resulting benefits, with interest;

E.     Ordering appropriate equitable relief, including but not limited to an appropriate monetary award based on disgorgement, restitution, surcharge or other basis;

F.     Awarding Plaintiff disbursements and expenses of this action, including reasonable attorneys' fees, in amounts to be determined by the Court; and

G.     Granting such other and further relief as is just and proper in light of the evidence.


Dated: February 6, 2019                    */s/ Shawn P. Naunton*
                                           D. Brian Hufford
                                           Jason S. Cowart
                                           Shawn P. Naunton
                                           Anant Kumar
                                           Nell Z. Peyser
                                           ZUCKERMAN SPAEDER LLP
                                           485 Madison Avenue - 10th Floor
                                           New York, NY 10022
                                           212.704.9600
                                           212.704.4256 (fax)
                                           dbhufford@zuckerman.com
                                           jcowart@zuckerman.com
                                           snaunton@zuckerman.com
                                           akumar@zuckerman.com
                                           npeyser@zuckerman.com

                                           Meiram Bendat
                                           PSYCH-APPEAL, INC.
                                           8560 West Sunset Boulevard, Suite 500
                                           West Hollywood, CA 90069
                                           310.598.3690 Ext: 101
                                           888.975.1957 (fax)
                                           mbendat@psych-appeal.com

                                           John W. Leardi
                                           Vincent N. Buttaci
                                           Paul D. Werner
                                           BUTTACI LEARDI & WERNER LLC
                                           103 Carnegie Center, Suite 323

41

Princeton, NJ 08540
609-799-5150
609-799-5180 (fax)
jwleardi@buttacilaw.com
vnbuttaci@buttacilaw.com
pdwerner@buttacilaw.com
*Counsel for Plaintiff and the Putative Classes*